**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **LINDSEY BAKER,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **Civil Action No. 3:21-CV-03126-BH** |
| | § | |
| **KILOLO KIJAKAZI,** | § | |
| **ACTING COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| **Defendant.** | § | **Consent Case**[1] |

## MEMORANDUM OPINION AND ORDER

Based on the relevant filings, evidence and applicable law, the final decision of the Commissioner of Social Security (Commissioner) denying the plaintiff's claims for Disability Insurance Benefits (DIB) under Title II of the Social Security Act is **AFFIRMED**.

### I.    BACKGROUND

Lindsey Baker (Plaintiff) filed her application for DIB on August 11, 2019, alleging disability beginning on November 1, 2014. (doc. 7-1 at 277-79.)[2] Her claim was denied initially on September 24, 2019, and upon reconsideration on April 21, 2020. (*Id.* at 192-200, 202-13.) After requesting a hearing before an Administrative Law Judge (ALJ), she appeared and testified at a hearing, which was held by telephone due to the coronavirus pandemic, on January 13, 2021. (*Id.* at 169-90.) That day, she amended her alleged onset date to November 21, 2017, the date of her "failed" back surgery. (*Id.* at 121, 288.) On February 19, 2021, the ALJ issued a decision finding her not disabled. (*Id.* at 105-15.) On March 3, 2021, Plaintiff timely appealed the ALJ's decision to the Appeals Council, which denied her request for review on September 21, 2021,

---

[1] By consent of the parties and order filed May 2, 2022 (doc. 11), this matter has been transferred for the conduct of all further proceedings and the entry of judgment.

[2] Citations to the record refer to the CM/ECF system page number at the top of each page rather than the page numbers at the bottom of each filing.

making the ALJ's decision the final decision of the Commissioner. (*Id.* at 10-14, 274-76.) She

timely appealed the Commissioner's decision under 42 U.S.C. § 405(g). (doc. 1.)

**A. <u>Age, Education, and Work Experience</u>**

Plaintiff was born on January 5, 1982; she was 38 years old on the date last insured. (doc.

7-1 at 277-78.) She had at least a high school education, could communicate in English, and had

past relevant work as a phlebotomist and office manager. (*Id.* at 172-73, 291.)

**B. <u>Medical Evidence</u>**

On May 8, 2017, Plaintiff presented to Christus Health for pre-operative counseling prior

to laparoscopic sleeve gastrectomy. (*Id.* at 430-31.) She was positive for back pain and arthralgias

and negative for joint swelling. (*Id.*) Two days later, she had an uneventful surgery and post-

operative recovery. (*Id.* at 425-26.) On discharge, she had a normal range of motion with no edema

or tenderness in the extremities, and she was ambulating in the hall. (*Id.*)

On July 21, 2017, Plaintiff visited her primary care provider, Samuel Raborn, M.D. (PCP),

at The University of Texas Health East Texas (UT Health). (*Id.* at 552.) She complained of tailbone

pain that had come and gone for a "couple" years. (*Id.*) Her lower coccyx was tender, and she was

prescribed Tylenol "for a few days to see if it w[ould] help." (*Id.* at 553.)

On October 22, 2017, Plaintiff was taken by ambulance to the emergency room (ER) at

Christus Health for progressively worsening back pain, with pain radiating down her lower

extremities over the prior two days. (*Id.* at 449.) On a scale of 10, she rated her pain at 9 with

movement, but it improved to 6/10 after she was given fentanyl en route to the hospital. (*Id.*) She

reported no relief with Tylenol and being unable to get around her house because of pain. (*Id.*) The

next day, she presented to PCP, reporting exacerbated pain but no injury. (*Id.* at 448.)

On November 1, 2017, Plaintiff returned to PCP for pre-operative clearance before surgery

due to back pain. (*Id.* at 556-59.) She required laboratory findings with a chest radiography and an electrocardiogram (EKG), as well as a letter assessing her pulmonary and cardiology risk. (*Id.* at 556.) She complained of back pain at L4-L5 but had a normal physical examination, and she reported exercising at least twice a week. (*Id.* at 557-58.) Her chest x-rays were negative, her EKG was "ok", and her risk from a cardiac and pulmonary standpoint was low. (*Id.* at 558.)

On November 21, 2017, Plaintiff presented to All American Orthopedic and Sports Medicine Institute for a posterolateral interbody arthrodesis at L5-S1, partial laminectomy, foraminotomies, and a partial facetectomy at L5-S1. (doc. 7-3 at 416.) At her three-month follow-up on February 15, 2018, Plaintiff had stopped taking muscle relaxers and pain medications, and she reported doing "well". (*Id.* at 424.) She had normal gait and station, non-tender paraspinal muscles, and 5/5 strength, but increased pain and limited range of motion with flexion and limited range of motion with extension and bilateral rotation. (*Id.* at 424-25.) Her provider noted that Plaintiff was "really doing great", referred her for physical therapy, and gave her a one-year follow-up unless she had any problems. (*Id.* at 426.)

On July 2, 2018, Plaintiff returned to PCP at UT Health, complaining of left knee pain from twisting her knee while playing baseball. (doc. 7-1 at 577.) She reported climbing up and down a ladder to paint, which "ha[d] not helped". (*Id.*) Her left knee had swelling, pain on range of motion, and tenderness above the joint line and superior to the patella. (*Id.* at 578.) She was assessed with acute pain of the left knee and advised to use a wrap with ice and a steroid taper and to elevate her knee "when she c[ould]". (*Id.*) She would be referred if she did not improve. (*Id.*) Within a year, she received an orthopedic referral. (*See id.* at 592.)

On June 28, 2019, Plaintiff presented to Azalea Spine Center for an orthopedic evaluation by Scott Burlison, M.D. (Orthopedist), complaining of chronic back pain. (*Id.* at 592-96.) She had

5/5 motor strength in the bilateral hip flexion, knee extension/flexion, and ankle dorsiflexion/plantar flexion, but the lumbosacral paraspinals were tender bilaterally. (*Id.* at 595.) She reported that she was able to care for herself. (*Id.* at 593.) She had bilateral adverse neural tension and decreased sensation to light touch through the bilateral lower extremity dermatomes and feet. (*Id.* at 595.) She also had a positive Kemps facet-loading test bilaterally and a positive straight leg raise. (*Id.*) Her pain worsened with standing, walking, and sitting. (*Id.* at 593.) She was assessed with chronic pain syndrome, lumbar post-laminectomy syndrome, lumbar radiculopathy, and lumbosacral spondylosis. (*Id.* at 595.) A spinal cord stimulator was ordered pending the results of a lumbar magnetic resonance imaging (MRI). (*Id.*)

A lumbar MRI on July 24, 2019 revealed a small posterior annular tear with mild annular disc bulging at L2-L3, but no facet arthropathy and no central canal or foraminal stenosis. (doc. 7-3 at 304.) At L3-L4, there was disc desiccation with a mild annular disc bulge and mild facet hypertrophy, and there was no central canal or foraminal stenosis. (*Id.*) At L4-L5, there was an anterior and posterior lumbar fusion, and the central canal and neural foramina were widely patent. (*Id.*) At L5-S1, there was anterior posterior lumbar fusion, and the central canal was widely patent, but there was no foraminal stenosis. (*Id.*)

On August 23, 2019, Plaintiff filed an adult disability report alleging several physical conditions as a basis for disability, including back injury, arthritis, degenerative disc disease, chronic pain syndrome, lumbar radiculopathy, lumbosacral spondylosis, lumbar post-laminectomy syndrome, and chronic back pain. (doc. 7-1 at 291-92.)

On September 1, 2019, Plaintiff's spouse completed a third-party function report, stating that he spent 8 to 10 hours a day with her, cooking and caring for their children. (*Id.* at 322-29.) He noted that she was unable to lift 5 pounds due to doctor's orders and could not sit, stand, or

walk for more than 5 to 10 minutes at a time before needing to rest for 5 to 10 minutes. (*Id.* at 322, 327-28.) She drove the children to school and picked them up. (*Id.* at 323.) Plaintiff needed help with grooming, bathing, and dressing, but she did not need reminders to take medications or go places. (*Id.* at 323-24, 326.) She washed the dishes and took care of the laundry, but only for 5 minutes at a time. (*Id.* at 324.) She went outside 2 to 3 times a day and did not need help going out alone, except occasionally. (*Id.* at 325-26.) She shopped online and could handle her personal finances, but she could not pay attention for more than 5 minutes before she needed to move due to pain. (*Id.* at 324, 327.) She had trouble with her ability to lift, squat, bend, stand, reach, walk, sit, knee, climb stairs, and complete tasks, but she was able to finish what she started, follow spoken instructions, get along with authority figures, handle stress, and deal with changes in routine "very well". (*Id.* at 327-28.) She wore a back brace that a surgeon had prescribed to her in 2010 and 2017. (*Id.* at 328.) The same day, Plaintiff filed a nearly identical adult function report, except she stated that she was waking up 7 to 8 times a night due to pain. (*Id.* at 341-48.)

On September 5, 2019, Plaintiff presented to Orthopedist at Baylor Scott & White Texas Spine & Joint Hospital for a spinal cord stimulator trial. (doc. 7-3 at 482-83.) He diagnosed her with chronic pain syndrome and radiculopathy, lumbar region. (*Id.* at 482.) She "tolerated the procedure well," and imaging revealed "[e]xcellent placement" of the needle and leads for spinal cord stimulator trial. (*Id.* at 483.)

On September 12, 2019, Plaintiff returned to Orthopedist for a follow-up and complained of back pain. (*Id.* at 474-82.) She had 50 to 60 percent relief below the mid-thigh area, but she did not have as good a response from her lower back to her mid-thigh. (*Id.* at 475.) She had improved range of motion, improved ability to perform activities of daily living, and the ability to stand for "extended periods of time which she was unable to do prior to [spinal cord stimulator]". (*Id.*) She

had a healed incision but no atrophy, crepitus, or edema; 5/5 bilateral hip flexion, knee extension/flexion, ankle dorsiflexion/plantar flexion; lumbosacral paraspinals tender bilaterally; decreased sensation to light touch through bilateral lower extremity dermatomes and feet; and a positive straight leg raise and Kemps facet-loading test bilaterally. (*Id.* at 477.) She was assessed with chronic pain syndrome, lumbar post-laminectomy syndrome, lumbar radiculopathy, and lumbosacral spondylosis. (*Id.* at 477-78.)

On September 23, 2019, state agency medical consultant (SAMC) Amita Hegde, M.D., completed a physical residual functional capacity (RFC) assessment based on the evidence of record. (doc. 7-1 at 192-200.) She noted that Plaintiff complained of a back injury, arthritis, degenerative disc disease, chronic pain syndrome, lumbar radiculopathy, lumbosacral spondylosis, lumbar post-laminectomy syndrome, and chronic back pain. (*Id.* at 192.) She considered Plaintiff's reported activities of daily living, a May 2016 MRI of the lumbar spine showing post-surgical changes and fusion at L4-6, a June 2016 lumbar epidural steroid injection, a July 2016 examination showing Plaintiff had "significant[ly] improve[d]" after the injection, and a May 2018 treatment note indicating Plaintiff had been cleared to resume physical activity after a lower back fusion. (*Id.* at 195-96.) She opined that Plaintiff had the severe impairment of "disorders of back–discogenic and degenerative", and that her allegations were partially consistent with, but not fully supported by, the medical evidence of record. (*Id.* at 196-97, 199.) She also opined that Plaintiff could occasionally lift and/or carry 10 pounds, frequently lift and/or carry less than 10 pounds, stand and/or walk 2 hours combined, sit for about 6 hours in an 8-hour workday, push and/or pull on an "unlimited" basis other than as specified for lift and/or carry, and occasionally balance, stop, kneel, crouch, crawl, and climb ramps/stairs but never climb ladders/ropes/scaffolds, and she had no manipulative, visual, communicative, or environmental limitations. (*Id.* at 197-98.) She found that

6

Plaintiff was limited to sedentary work and could perform as a charge account clerk, food and beverage order clerk, and telephone quotation clerk. (*Id.* at 200.)

On September 24, 2019, Plaintiff presented to Texas Arthritis Rheumatology Specialists for a consultation by Glen Graves, M.D. (Rheumatologist). (*Id.* at 608-12.) She reported that her pain was aggravated by bending, twisting, lifting, sitting for long periods, and rising from a seated position. (*Id.* at 608.) She also reported that the spinal stimulator trial "did not help very much", that the medications Gabapentin, Lyrica, and Robaxin were ineffective, and that Tylenol and ice decreased her pain but did not resolve it. (*Id.*) She had mild thoracic muscular pain but normal range of motion in all four extremities and no active synovitis in the upper or lower extremities. (*Id.* at 611.) She had some myofascial tenderness in her back; she was assessed with back pain and myalgia, and she was prescribed Cymbalta, Prednisone, and Tylenol Extra Strength. (*Id.* at 611-12.) Laboratory findings were ordered to rule out an inflammatory disease. (*Id.* at 611.)

At a follow-up visit with Rheumatologist on December 5, 2019, Plaintiff reported that Prednisone gave her a rash and Cymbalta made her jittery and dizzy, neither medication provided relief, and she had stopped taking both. (*Id.* at 603.) She also reported that she had twisted her ankle three weeks earlier and had swelling in the ankle and increasing pain since then. (*Id.*) She complained of constant pain in her thoracic spine, lumbar spine, bilateral hips, bilateral ankles, bilateral shoulders, right elbow, and bilateral knees. (*Id.*) Her pain was at 7/10, and she asked for treatment options. (*Id.*) She was positive for bone/joint symptoms and myalgia. (*Id.* at 605.) She had no active synovitis in the upper and lower extremities but did have mild left ankle tenderness. (*Id.* at 603, 605.) She was assessed with joint pain, back pain, stiffness of unspecified joint not elsewhere classified, anemia, and left ankle pain. (*Id.* at 606.) Her laboratory findings revealed no inflammation and no evidence of an autoimmune disease. (*Id.*) She was administered a Depo-

7

Medrol injection. and imaging was ordered. (*Id.*) The next day, left ankle x-rays revealed a "small plantar spur", but no pathologic calcifications, fracture, or subluxation. (*Id.* at 617, 619.)

In a second adult function report dated March 24, 2020, Plaintiff stated that she lived in a house with family. (*Id.* at 367-76.) She could sit or stand 5 to 10 minutes before needing to change positions, lift no more than 5 pounds without increased pain, carry no more than 10 pounds, walk 5 minutes before needing to rest 5 to 10 minutes; when she was unable to stand, she wore a back brace that was prescribed to her in 2010 and 2017. (*Id.* at 367, 372-73.) She did minor cleaning, some laundry folding, went outside daily, and prepared meals on the weekend with her spouse. (*Id.* at 369-70.) She walked and drove but could not go out alone in case she lost feeling in her legs. (*Id.*) Her hobbies included crocheting, photography, reading, and watching sports, but she did not do these often because they required long periods of sitting. (*Id.* at 366.) When she could, she took her kids to school 3 to 4 times a week and went to the store "when [she] c[ould]", "only when pain [wa]s controlled", and about once or twice a month. (*Id.* at 370-71.) Plaintiff's condition affected her ability to lift, squat, bend, stand, reach, walk, sit, kneel, climb stairs, complete tasks, and concentrate, but she could manage her finances and did not need reminders to go places, groom, or take medications. (*Id.* at 366, 369-70, 372.) She "eventually" completed what she started and could pay attention for 15-20 minutes, depending on her pain level. (*Id.* at 372.) She did "well" with written instructions, but it usually took longer than it should, and she did "ok" with verbal instructions if she was able to focus and manage her pain. (*Id.*)

On April 20, 2020, SAMC Dennis Pacl, M.D., completed a physical RFC assessment based on the evidence of record. (*Id.* at 202-13.) He considered Plaintiff's allegation that her condition had changed in September 2019 because of a "failed' spinal cord stimulator trial and because the provider refused to order a permanent stimulator "due to no relief". (*Id.* at 203.) SAMC Pacl also

considered Rheumatologist's September 2019 findings that she had some myofascial tenderness limited to the back, but a normal examination, and his December 2019 findings that she had mild tenderness in her ankle due to twisting it three weeks earlier, but a normal examination otherwise. (*Id.* at 207-08.) He specifically stated that SAMC Hegde's assessment was "overly restricted" based also on the medical evidence of record available after the initial review. (*Id.* at 211.) He opined that Plaintiff could occasionally lift and/or carry 20 pounds, stand and/or walk 3 hours combined, perform unlimited balancing, and occasionally climb ladders/ropes/scaffolds. (*Id.* at 209-10.) Like SAMC Hegde, he also limited Plaintiff to sedentary work. (*Id.* at 212.)

In a To Whom It May Concern letter dated June 15, 2020, PCP stated in relevant part:

[Plaintiff] is a patient at [UT Health]. She has had several surgical procedures with the first fusion in 2010 at the L4-L5 level which helped for a couple of years. [Three] years ago she had … a L5-S1 fusion which did not help any of her symptoms. She has had extensive conservative treatment since the last surgery including physical therapy, chiropractic therapy, medication treatment, and injections. None of these have helped her pain.

As a result, this is an ongoing issue that is not expected to resolve in 12 months and probably longer since all the modalities tried have not been successful. She has been advised to lay and elevate her feet for 15 minutes each day and elevate her feet for 15 minutes each hour to relieve pressure from her lumbar spine. She has to transition from standing to sitting to walking about every 15 minutes. If she sits for more than 15 minutes she will have numbness in her feet. She would definitely miss more than 5 day[s] of work per month due to worsening of her pain or flairs in her condition even if these accommodations were met. She is not to lift more than 10 [pounds] at any time. She should not stand for more than 15-20 minutes at a time and when sitting should elevate her feet. These will be ongoing and possibly permanent since the therapies tried have not been successful.

(doc. 7-4 at 819.)

On July 21, 2020, Plaintiff underwent a revision posterior lateral intertransverse fusion bilaterally at L5-S1, exploration fusion and hardware removal bilaterally at L5-S1, and open lumbar rhizotomy of the facet joint bilaterally at L4-L5. (*Id.* at 260-64.) There were no complications. (*Id.* at 264.) Hours later, she could turn by herself, move her legs "with no

9

problem", had 6/10 pain, and was scheduled to be discharged. (*Id.*)

On September 30, 2020, Plaintiff presented to Medical City Heart and Spine for an anterior lumbar osteotomy at L5 and S1, anterior lumbar fusion at L5-S1, and instrumentation at L5-S1 by providers at Texas Back Institute. (*Id.* at 753, 756.) There were no complications. (*Id.* at 757.)

On November 4, 2020, Plaintiff presented to Texas Back Institute for a six-week follow-up with Jeremy Dollar, PA-C (Physician Assistant). (*Id.* at 777.) She reported no neck pain, 1/10 arm pain, 4/10 mid-back pain, 4/10 leg pain, and 5/10 lower back pain. (*Id.*) She had continued to improve, took less pain medication, had been compliant in wearing a brace, and was no longer required to wear it. (*Id.* at 777-78.) Imaging revealed no sign of hardware failure at L5-S1. (*Id.* at 778.) She was referred to physical therapy. (*See id.* at 782.)

On December 7, 2020, Plaintiff presented to Therapeutic Partners of Texas for her fifth session of skilled physical therapy services. (*Id.* at 782-83.) She reported tightness and pain in her lower back and left poster hip but denied any soreness from the last session. (*Id.* at 782.) The treatment note indicated she tolerated the session "well" and had muscle guarding in the lumbar paraspinals that decreased with soft tissue mobilization. (*Id.*) It also indicated that she continued to benefit from physical therapy and had no increase in symptoms with exercises. (*Id.*)

On December 15, 2020, Plaintiff presented to Physician Assistant for a three-month follow-up. (*Id.* at 815.) Lumbar x-rays revealed no sign of hardware failure at L5-S1. (*Id.* at 816.) She had "some" lower back pain symptoms through the back side and upper hamstring "likely" related to sacroiliitis. (*Id.*) She was advised to continue physical therapy and bilateral sacroiliitis joint injections followed by radiofrequency ablation treatment, if appropriate. (*Id.*)

C.  **January 13, 2021 Hearing**

On January 13, 2021, Plaintiff and an impartial VE testified at a hearing before the ALJ.

(doc. 7-1 at 169-90.) Plaintiff was represented by an attorney. (*Id.*)

### 1. *Plaintiff's Testimony*

Plaintiff testified that she was 39 years old; she had graduated from high school and completed one year of college. (*Id.* at 172.) She had done some consulting work to supplement her income but had not performed substantial work since November 2014. (*Id.*) She had worked as a phlebotomist from 2004 to 2009 and from 2010 to 2014. (*Id.*) From 2009 to 2010, she had worked as an office manager for a manufactured home company, managing two employees in the servicing department, and performing furniture stocking, scheduling, and inventory for the East Texas locations. (*Id.* at 173.)

Plaintiff lived with her husband, who was employed, and two children, ages 5 and 7. (*Id.*) She spent her time "maintain[ing]" the house, trying to do house chores, cooking, meal preparation, and childcare, such as taking her children to different activities. (*Id.* at 173-74.) She went to physical therapy twice a week to relieve the pain and improve her symptoms. (*Id.* at 174.) She had an appointment with a new pain management doctor the day after the hearing, and she would "soon" see a geneticist and a rheumatologist for "continued" treatment and "further" testing. (*Id.*) For primary care, she saw PCP at UT Health; she had last seen him for a telehealth visit a "couple" months earlier. (*Id.*)

On cross-examination, Plaintiff testified that around 2009 she underwent testing and began receiving injections to alleviate her back pain, but it was not helping as her providers had anticipated. (*Id.* at 175.) Treatments intended to last years lasted only days. (*Id.*) She was not considered for surgery due to her age, so she was referred to a surgeon in Dallas. (*Id.*) He performed several treatments, beginning in 2010 with a minimally invasive laminectomy and discectomy to prevent the disc from pressing on the nerves. (*Id.*) Later that year, she underwent her first spinal

fusion followed by physical therapy, but that helped for only a "couple" years. (*Id.* at 175-76.) She was then administered epidural injections, steroid injections, and nerve blocks to try to delay another surgery. (*Id.* at 176.)

In 2017, Plaintiff returned to the surgeon in Dallas for a second spinal fusion followed by physical therapy. (*Id.*) Upon returning for a follow-up, she learned that the surgeon had been indicted, the hospital in which he had partial ownership had been shut down, and it was not possible to get her medical records for continued care because the government had them. (*Id.*) She began looking for a new physician to treat her without these records, and in 2020, Plaintiff found one who ordered imaging and discovered that her second spinal fusion had failed; she had no bone growth on the fusion, and her bones had "never fused." (*Id.*) The physician advised her to remove the defective hardware because the screws were "backing out" and "broken." (*Id.*)

Plaintiff underwent a third spinal fusion in September 2020. (*Id.*) Four months later, she "still" had no bone growth, which was a problem, so her physician began considering "more invasive" surgeries. (*Id.*)

Plaintiff had received a rheumatology and genetics referral to test for two conditions that were "easily misdiagnosed": aggressive rheumatoid arthritis and Ehlers-Danlos Syndrome, a connective tissue disorder. (*Id.* at 177.) She had weakness and progression of joint deterioration, and her fusion was "not healing"—these symptoms were "very close" to both conditions. (*Id.*) She underwent "more invasive testing" to determine the proper course of treatment for pain relief and to slow the progression of joint deterioration (*Id.*)

Before December 31, 2018, Plaintiff "primarily" had pain in her middle to lower back, radiating through her hips and legs and down to her feet and causing numbness, tingling, and some weakness. (*Id.* at 177-78.)

In his letter dated June 15, 2020, PCP indicated that Plaintiff needed to elevate her feet for 15 minutes each hour to relieve the pressure on her spine, which is something that she had been doing since her 2017 surgery. (*Id.* at 178.) If she did not do this, she would start losing feeling in her feet, and the numbness in her legs and weakness got worse. (*Id.*) She would lie in a flat position and elevate her head and feet to a "zero gravity" position to take the pressure off her hips and back. (*Id.* at 178, 185.) She was unable to do this from a sitting position because the degree was "too extensive" and caused more pain. (*Id.* at 178.) Her feet started to feel numb after sitting for about 10 to 15 minutes, so since 2017, she would get up, walk around, or lie down. (*Id.* at 178-79.) Changing positions was "important" to her to prevent weakness and losing feeling in her legs. (*Id.* at 180, 184-85.) She was "constantly" having to make sure she did not do one activity for "too long" because it would "pose a problem later on." (*Id.* at 184-85.) She had to stand up during the hearing. (*Id.* at 185.)

Plaintiff was limited to lifting 10 pounds "per the doctor's orders" but "struggle[d]" to "even do that." (*Id.* at 179.) She was only required to lift 5 pounds at physical therapy because she could not do more. (*Id.*) She could "[v]ery minimal[ly]" reach overhead to work and could not raise her right arm due to shoulder pain. (*Id.* at 180.) She was right-handed and could count coins and stack them; her ability varied from "day to day" due to arm and shoulder pain that made it "really hard" to do fine motor skills, but she could "manage to get it done." (*Id.* at 179.)

Plaintiff could not bend because of shooting pain and weakness, and she could not stoop and get back up due to weakness in her legs and knees. (*Id.* at 180.) She had been prescribed a temporary "walking aid" for stability after surgery, but it had not been prescribed permanently at the time of the hearing. (*Id.*) Her legs were weak, and her feet did not move "sometimes." (*Id.*) She had tripped but not "fallen completely to the ground" because she had "c[aught] [her]self"

13

"most recently." (*Id.*) She could walk about 100 yards without pain; she could walk farther, but it was difficult and caused her "shooting pain." (*Id.*) She could walk and stand for 15 or 20 minutes before needing to sit down. (*Id.* at 176.) She "usually" had to push the shopping cart when she went to the grocery store. (*Id.* at 180.)

Plaintiff could drive about 30 minutes before needing to stretch her legs and change positions or she would start to lose feeling in her feet, and that worried her. (*Id.* at 181.) She tried not to drive long distances because she could also lose feeling in her fingers when "gripping" the steering wheel. (*Id.*) During the two-hour drive a day earlier to the city in which the hearing was held, she had to stop three or four times; she had spent the night at her mother's house in order to be on time for the hearing before the ALJ. (*Id.*)

Plaintiff was awake three to four hours every night due to pain; she slept no more than a "couple hours at a time" and an "average of four to six hours a night[] intermittently". (*Id.* at 182.) Because she was drowsy and tired the next day, she was unable to stand or sit for "very long", did the cooking and housework in "increments", and needed to rest during the day—things she never had to do before. (*Id.* at 182, 184.) She did this to care for her children, who required "a lot of attention", and she was "constant[ly] readjusting and trying to figure out ways to manage the pain." (*Id.* at 182.)

Plaintiff took the muscle relaxer Methocarbamol three times a day. (*Id.*) The muscle relaxer Fleveril had made her "very drowsy" and unable to function because she was "already" "very fatigued". (*Id.* at 183.) She had been prescribed several types of pain medications and took Oxycontin every 12 hours for pain, and Oxycodone once or twice a day for "breakthrough pain". (*Id.* at 182-83.) Before she figured out what she could not take, she had experienced side effects and "severe reactions" to the nerve pain medications of Lyrica, which she had tried recently, and

Gabapentin. (*Id.* at 183.)[3] The "combination" of her medications "ma[d]e" her a "neuro-relaxer requirement". (*Id.*) She took medications and vitamins to strengthen her bones, but they damaged her gut. (*Id.*) She had to be "cautious" in taking things like probiotics for "overall" "good" health because "a lot" of medications went through her liver. (*Id.*) She did not want to take medications, and taking them long term worried her, but she took them "just to function". (*Id.*)

Plaintiff was able to dress herself on a typical day. (*Id.* at 184.) Although she was able to turn on the washing machine and start the laundry, it was "difficult" to do the rest because she could not lift or carry laundry baskets or bend over to pick them up. (*Id.*) Her husband helped with childcare and household chores such as grocery shopping. (*Id.* at 179, 184.)

PCP treated Plaintiff for ten years or more and had been her family physician for a "very long time." (*Id.* at 185.) He had seen her through "many" health issues and was "pretty knowledgeable" about the "demands" of her back and about how to alleviate the pain. (*Id.*) Since 2018, he had instructed her to elevate her feet and had limited her walking, sitting, and lifting. (*Id.*)

On examination, Plaintiff testified that PCP was "just" her primary care provider and that she did not see him "regularly" for back pain. (*Id.* at 186.) She instead saw him for "sickness" or if she needed laboratories for surgeries. (*Id.*) She was not sure when was the last time she had seen him before his June 2020 letter, but she was "certain" she had seen him. (*Id.*)[4]

As an office manager for the manufactured home company, Plaintiff was required to count axils in the yard and move "heavier" objects such as tires. (*Id.* at 187.) She also helped to furnish three to five homes in the company's lot every one to two weeks, so she was carrying 50 pounds

---

[3] Plaintiff also took medication for another unspecified condition. (doc. 7-1 at 183.)

[4] The ALJ orally noted that he did not see any treatment records by PCP between July 2018 and June 2020, and he asked Plaintiff whether there was a lapse in treatment, whether there were any missing records, and whether she had not seen PCP for a period of two years. (doc. 7-1 at 185-86.)

several times a week but not "daily". (*Id.*)

### 2. *VE's Testimony*

The VE testified that Plaintiff had past relevant work as a phlebotomist (DOT 079.364-022, light, SVP-3) and office manager (DOT 219.362-010, light, SVP-4). (*Id.* at 188.)

The VE first considered a hypothetical individual who had Plaintiff's age, education, and education and could perform sedentary work, as defined by the DOT, but was limited to "only" occasional postural activities with occasional overhead work. (*Id.*) The individual could not perform Plaintiff's past work but could perform a "full range of sedentary work", such as a document preparer (DOT 249.587-018, sedentary, SVP-2), with 19,000 full-time positions nationally; surveillance system monitor (DOT 379.367-010, sedentary, SVP-2), with 38,500 full-time positions nationally; and cutter/paster (DOT 249.587-014, sedentary, SVP-2), with 11,800 full-time positions nationally. (*Id.* at 189.)

The VE then considered a second hypothetical individual "similar to [Plaintiff]" who "needs additional work breaks through the day, up to ten minutes, at least ten minutes each hour". (*Id.*) She did not "believe" that limitation would be "allowed" in competitive employment, or that the individual would be able to sustain any occupations with the need to take ten-minute breaks eight times a day. (*Id.*)

On cross-examination, the VE opined that "the hypothetical individual" who needed to elevate her legs for at least 15 minutes each hour at an angle of 90 degrees would be precluded from sedentary work. (*Id.*)

### D. **ALJ's Findings**

The ALJ issued an unfavorable decision on January 13, 2021. (*Id.* at 105-15.) At step one, he found that Plaintiff had not engaged in substantial gainful activity since her amended alleged

onset date of November 21, 2017, through her date last insured of December 31, 2019. (*Id.* at 108.) At step two, he found that Plaintiff had the severe impairments of degenerative disc disease and osteoarthritis and no non-severe or medical determinable impairments. (*Id.*) At step three, the ALJ concluded that Plaintiff's impairments did not singularly or in combination meet or medically equal the required criteria for any of the listed impairments in 20 C.F.R. § 404, Subpart P, Appendix 1 (20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526). (*Id.*) He expressly considered Listings 1.02 and 1.04 in his findings. (*Id.*)

Next, the ALJ found that Plaintiff retained the residual functional capacity (RFC) to perform sedentary work, as defined in 20 C.F.R. § 404.1567(a), except occasional "postural[]" limitations, including occasional overhead reaching, and avoid work hazards. (*Id.* at 109.) At step four, he determined that Plaintiff had past relevant work as a phlebotomist and office manager. (*Id.* at 113.) At step five, the ALJ found that transferability of job skills was not an issue in the determination of disability because the Medical-Vocational Rules supported a finding that she was not disabled regardless of whether she had transferable job skills, but considering her age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that she could perform. (*Id.* at 114.) Accordingly, the ALJ determined that Plaintiff had not been under a disability, as defined by the Social Security Act, since her application was filed on August 11, 2019, through the date last insured on December 31, 2019. (*Id.* at 115.)

## II.   STANDARD OF REVIEW

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence. *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994); 42 U.S.C. §§ 405(g), 1383(C)(3). Substantial evidence is defined as more than a

scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). In applying the substantial evidence standard, the reviewing court does not reweigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present. *Greenspan*, 38 F.3d at 236. A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision. *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

The scope of judicial review of a decision under the supplemental security income program is identical to that of a decision under the social security disability program. *Davis v. Heckler*, 759 F.2d 432, 435 (5th Cir. 1985). Moreover, the relevant law and regulations governing the determination of disability under a claim for disability insurance benefits are identical to those governing the determination under a claim for supplemental security income. *See id.* The court may therefore rely on decisions in both areas without distinction in reviewing an ALJ's decision. *See id.*

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563-64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988). The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *Anthony v. Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant

is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work [s]he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes h[er] from performing h[er] past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability. *Leggett*, 67 F.3d at 564. The analysis terminates if the Commissioner determines at any point during the first four steps that the claimant is disabled or is not disabled. *Id.* Once the claimant satisfies her burden under the first four steps, the burden shifts to the Commissioner at step five to show that there is other gainful employment available in the national economy that the claimant is capable of performing. *Greenspan*, 38 F.3d at 236. This burden may be satisfied either by reference to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other similar evidence. *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987). A finding that a claimant is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

### III.   ISSUES FOR REVIEW

Plaintiff presents the following issues for review:

1.  The ALJ improperly rejected post-DLI [date last insured] medical records.

2. The ALJ erred by failing to properly evaluate [PCP]'s medical opinion, including by failing to evaluate the 10-year length of the doctor-patient treating relationship, in violation of 20 C.F.R. § 404.1520c.

(doc. 16 at 9, 12.)

## A.  Consideration of Evidence Post-Date Last Insured

Plaintiff contends that the ALJ "*did not consider* evidence after the DLI at all and simply disregarded it outright", and that "outright rejection of this evidence was improper". (doc. 16 at 9) (emphasis in original). She relies on *Luckey v. Astrue*, 458 F. App'x 322, 326 (5th Cir. 2011), for the proposition that "[p]ost-DLI evidence is relevant because 'it may bear upon the severity of the claimant's condition before the expiration of his or her insured status.'" (*Id.*)

Claimants are "eligible for benefits only if the onset of the qualifying medical impairment began on or before the date the claimant was last insured." *Ivy v. Sullivan*, 898 F.2d 1045, 1048 (5th Cir. 1990) (citing POMS § DI 25501.050(B)(1)). They "bear the burden of establishing a disabling condition before the expiration of their insured status." *Id.* (citing *Milam v. Bowen*, 782 F.2d 1284 (5th Cir. 1986)). They must also present "objective medical evidence of a condition that reasonably could be expected to produce the level of pain alleged." *Harper v. Sullivan*, 887 F.2d 92, 96 (5th Cir. 1989) (citing *Owens v. Heckler*, 770 F.2d 1276, 1281 (5th Cir. 1985); *Harrell v. Bowen*, 862 F.2d 471, 481 (5th Cir. 1988); *Parfait v. Bowen*, 803 F.2d 810, 813 (5th Cir. 1986)).

"Evidence showing the degeneration of a claimant's condition after the [DLI] is not relevant to the Commissioner's … analysis." *McLendon v. Barnhart*, 184 F. App'x 430, 432 (5th Cir. 2006) (citing *Torres v. Shalala*, 48 F.3d 887, 894 n. 12 (5th Cir. 1995)). The Fifth Circuit has held, however, that "[s]ubsequent" medical evidence, i.e., evidence after the date last insured, or DLI, "is relevant ... because it may bear upon the severity of the claimant's condition before the expiration of his or her insured status." *Ivy*, 898 F.2d at 1049 (citing *Basinger v. Heckler*, 725 F.2d

1166, 1169 (8th Cir. 1984); *Parsons v. Heckler*, 739 F.2d 1334, 1340 (8th Cir. 1984) (finding that the court may consider any medical, psychological, or psychiatric evaluations made after the expiration of the claimant's insured status because "the mere fact that the examination was made following the expiration of insured status does not automatically make the examination irrelevant")).

Here, Plaintiff first points to the ALJ's discussion of her *pre*-DLI laboratories from a July 2019 lumbar MRI showing an anterior posterior lumbar fusion at L4-L5 and at L5-S1. (doc. 16 at 9 (citing doc. 7-1 at 111 (citing doc. 7-3 at 304.))) She then points to *post*-DLI medical evidence of laboratories and treatments, including (1) a December 2020 MRI indicating that there was no sign of hardware failure at L5-S1, although she "continue[d] to have some low back pain symptoms"; (2) a July 2020 revision posterior lateral intertransverse fusion L5-S1 bilaterally, exploration fusion and hardware removal bilaterally, and lumbar rhizotomy of the facet join bilaterally; and (3) a September 2020 anterior lumbar osteotomy L5 and S1, anterior lumbar fusion L5-S1 and instrumentation. (*Id.* at 10 (citing doc. 7-4 at 263, 753, 816.))[5] She contends that her treatments post-DLI "suggest" that she was "still experiencing pain" and "suffering from the same symptoms that she had less than a year earlier." (*Id.* at 9-10.) She further contends that these "additional records" could have changed the outcome of the case, warranting remand. (*Id.* at 10.)

Although the ALJ stated three times in his decision that his determination was based on "careful consideration of the *entire* record", (doc. 7-1 at 108-09) (emphasis added), after acknowledging that Plaintiff received "further treatment" after her DLI of December 31, 2019, he

---

[5] Plaintiff's brief references a "letter" which she contends "demonstrated that [she] was still in pain and required additional surgeries, stemming from conditions that existed during the pre-DLI time period". (doc. 16 at 10.) To the extent that she intended to argue that PCP's June 2020 letter was "additional evidence" that the ALJ failed to consider, his letter is discussed in the second issue.

stated that medical evidence of that treatment "will not be considered", (*id.* at 112). Nevertheless, the ALJ did discuss all three of the post-DLI medical records to which Plaintiff pointed in a "summary" of her post-DLI treatments:

> [A] revision posterior lateral intertransverse fusion L5-S1 bilaterally, exploration fusion and hardware removal bilaterally, and lumbar rhizotomy of the facet joint bilaterally L4-5 in July 2020 (Exhibit 23F/35). It also included an anterior lumbar osteotomy L5 and S1, anterior lumbar fusion L5-S1 and instrumentation in September 2020 (Exhibit 26F/16). At her six-week follow-up in November 2020, [Plaintiff] continued to improve and she took less pain medication (Exhibit 27F/9). Physical therapy in December 2020 noted [she] continued to benefit from skilled physical therapy services. She had no increase in symptoms with exercises (Exhibit 27F/13). At her six-month follow-up, x-rays showed no sign of hardware failure L5-S1, although she continued to report some pain (Exhibit 28F/12).

(doc. 7-1 at 112). Notably absent from Plaintiff's brief is any reference to her post-DLI physical therapy, from which she "continued to benefit", and which the ALJ could properly consider in reaching his determination. (*Id.* (citing doc. 7-4 at 782)); *see Johnson*, 864 F.2d at 348 ("If an impairment reasonably can be remedied or controlled by medication or therapy, it cannot serve as a basis for a finding of disability.") (citation omitted). Later in his decision, the ALJ considered pre-DLI medical evidence, including a treatment note showing "significant improvement with a trial of a spinal cord stimulator" although he noted that he had not seen evidence of a permanent one. (*Id.* at 113; *see* doc. 7-3 at 475, 477.) He also referenced Rheumatologist's evaluation "demonstrat[ing] full range of motion in all planes" as well as his laboratory findings "indicat[ing] no inflammatory or autoimmune disease". (*Id.* at 113; *see id.* at 603-06, 608-12.) The ALJ further noted that Plaintiff played baseball and climbed ladders during the period of alleged disability. (*Id.* at 110, 113; *see id.* at 577.) Because "evidence showing the degeneration of a claimant's condition after the [DLI] is not relevant to the Commissioner's … analysis", *McLendon*, 184 F. App'x at 432, the ALJ could properly conclude that "[w]hile [Plaintiff]'s condition may have worsened to require additional surgery, it was *after the period to be adjudicated*." (*Id.*) (emphasis added). In

addition, Plaintiff does dispute the ALJ's summary of the evidence or present any additional evidence that the ALJ did not consider. (*See* doc. 16); *Ivy*, 898 F.2d at 1048.

Contrary to Plaintiff's characterization, the ALJ did not "outright" reject Plaintiff's post-DLI medical evidence; he instead considered it along with pre-DLI medical evidence and implicitly found it was not relevant to whether she was disabled during the period at issue. (*Compare* doc. 16 at 9-10, *with* doc. 7-1 at 112.) Having found that it was not relevant, the ALJ could properly reject it. *See Russo v. Saul*, 805 F. App'x 269, 272 (5th Cir. 2020) ("Because [Plaintiff] bore the burden of proving that she was disabled before the expiration of her insured status, evidence describing her condition after her date last insured is not relevant.") (citing *Torres*, 48 F.3d at 894 n.12); *McLendon*, 184 F. App'x at 432 (finding "the ALJ did not err in declining to give retrospective consideration to the reports and evaluations of McLendon's post-[DLI] ailments"). Remand is not required on this issue.

## B.  <u>Medical Opinion Evidence</u>

The Commissioner is entrusted to make determinations regarding disability, including weighing inconsistent evidence. 20 C.F.R. §§ 404.1529, 416.929. Every medical opinion is evaluated regardless of its source, but the Commissioner "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s), including those from his medical sources." 20 C.F.R. §§ 404.1520c(a), 416.920c(a). A medical opinion is a statement from a medical source about what the claimant can still do despite his impairments and whether he has one or more impairment-related limitations or restrictions in the ability to perform common demands of work. 20 C.F.R. §§ 404.1513(a)(2), 416.913(a)(2).

The guidelines provide that the ALJ will explain in his determination or decision how

persuasive he finds "all of the medical opinions and all of the prior administrative medical findings in [the] case record." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b). "The measuring stick for an 'adequate discussion' is whether the ALJ's persuasiveness explanation enables the court to undertake a meaningful review of whether his finding with regard to the particular medical opinion was supported by substantial evidence, and does not require the [c]ourt to merely speculate about the reasons behind the ALJ's persuasiveness finding or lack thereof." *Cooley v. Comm'r of Soc. Sec.*, No. 2:20-CV-46-RPM, 2021 WL 4221620, at *6 (S.D. Miss. Sept. 15, 2021) (citations omitted). Five factors are considered in evaluating the persuasiveness of the medical opinion(s): (1) supportability; (2) consistency; (3) relationship with the claimant; (4) specialization; and (5) other factors which "tend[s] to support or contradict the opinion." 20 C.F.R. §§ 404.1520c(c)(1)-(5), 416.920c(c)(1)-(5). The most important factors to consider when evaluating the persuasiveness of medical opinions and prior administrative medical findings are supportability and consistency. 20 C.F.R. §§ 404.1520c(a), 416.920c(a). Supportability concerns the degree to which the objective medical evidence and supporting explanations of the medical source support his own opinions, while consistency concerns the degree to which the medical source's opinion is consistent with the evidence from other medical sources and nonmedical sources within the record. *See* 20 C.F.R. §§ 404.1520c(c)(1)-(2), 416.920c(c)(1)-(2). The ALJ must explain how he "considered the supportability and consistency factors for a medical source's medical opinions or prior administrative medical findings in [the] determination or decision." 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2). He may, but is not required to, explain how he considered the remaining factors. 20 C.F.R. §§ 404.1520c(b)(2), 416.920c(b)(2).

When a medical source provides multiple medical opinions, the ALJ will articulate how he "considered the medical opinions or prior administrative medical findings from that medical

source together in a single analysis using the factors," but he is not required to articulate how he considered each medical opinion or prior administrative medical finding from one medical source individually. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). In addition, when the ALJ "find[s]" that two or more medical opinions or prior administrative medical findings about the same issue are both "equally well-supported" and "consistent" with the record (as defined under this regulation), but are not exactly the same, he will articulate in his decision how he considered the remaining factors—i.e., subparts (c)(3) through (c)(5)—for those medical opinions or prior administrative medical findings. 20 C.F.R. §§ 404.1520c(b)(1), 416.920c(b)(1). The ALJ evaluates the persuasiveness of the opinions when determining disability, and the sole responsibility for a disability determination rests with him. *See Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) (citation omitted).

The Fifth Circuit has recognized that opinions of treating physicians are not entitled to considerable weight when they are "brief and conclusory" and "lack 'explanatory notes' or 'supporting objective tests and examinations.'" *See Heck v. Colvin*, 674 F. App'x 411, 415 (5th Cir. 2017) (citing *Foster v. Astrue*, 410 F. App'x 831, 833 (5th Cir. 2011)). District courts in this circuit have found that under the new regulations, brief and conclusory opinions unsupported by relevant medical evidence lack supportability. *See*, *e.g.*, *Bruen v. Kijakazi*, No. 1:20-CV-278 LGI, 2022 WL 452411, at *3 (S.D. Miss. Feb. 14, 2022) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best ... [but when] these so-called reports 'are unaccompanied by thorough written reports, their reliability is suspect.'") (citation omitted); *Benson v. Saul*, No. 3:20-CV-1974-E-BH, 2022 WL 868706, at *16 (N.D. Tex. Mar. 8, 2022), *report and recommendation adopted*, No. 3:20-CV-1974-E-BH, 2022 WL 865886 (N.D. Tex. Mar. 23, 2022) (finding that the lack of persuasiveness of the check-box form goes to

25

its lack of supportability); *Stephens v. Saul*, No. 3:20-CV-823-BH, 2020 WL 7122860 *8 (N.D. Tex. Dec. 4, 2020) (illustrating how less persuasive a "brief and conclusory" check-box questionnaire stands in comparison to a narrative statement, which contains substantive explanation) (citing *Heck*, 674 F. App'x at 415, and *Foster*, 410 F. App'x at 833)).

Here, PCP examined Plaintiff at least three times in person and once in a telehealth visit between July 2017 and June 2020. (doc. 7-1 at 552-52, 556-59, 577-78, 592, 819.) In July 2017, PCP examined Plaintiff for tail bone pain and prescribed her Tylenol "for a few days", and in November 2017, he examined her for a pre-operative clearance before surgery for back pain. (*Id.* at 552-53, 556-59.) During a July 2018 examination with PCP, she reported twisting her knee while playing baseball and aggravating it by climbing up and down a ladder. (*Id.* at 577.) PCP next saw her during a telehealth visit in June 2020. (doc. 7-4 at 819.)

The ALJ also considered PCP's letter and noted that, "[a]fter not seeking treatment from [PCP] since July 2018", she saw him in July 2020 by telehealth to "s[eek] a letter to support her disability." (doc. 7-1 at 112.) The ALJ specifically considered PCP's letter and his opinions that:

> [Plaintiff] was advised to lay and elevate her feet for 15 minutes each hour to relieve pressure from her lumbar spine. She had to transition from standing to sitting to walking about every fifteen minutes. If she sat for more than fifteen minutes, she would have numbness in her feet. She would definitely miss more than five days of work per month due to worsening or flares of her condition. [She] could not lift more than ten pounds at any given time. She would not be able to sit or stand for more than 15-20 minutes at a time, and when sitting, should elevate her feet.

(*Id.* at 112 (citing doc. 7-4 at 819.)) The ALJ found PCP's opinions "unpersuasive". (*Id.* at 112.) He first noted that PCP had examined Plaintiff only once in 2017 for pre-operative clearance before her back surgery. (*Id.*; *see id.* at 556-59.) He considered Plaintiff's testimony that she did not see PCP unless she had an "acute" illness. (*Id.* at 112; *see id.* at 186.) Similarly, he noted that that PCP was not treating her for back issues, and that the physicians treating her for back issues had not

26

placed any restrictions on her. (*Id.* at 113.) The ALJ also noted that PCP's opinion was "internally inconsistent" because "he advised that she 'l[ie] and elevate [her] feet 15 minutes a day' but then elevate her feet 15 minutes each hour to 'relieve pressure on the lumbar spine' and then elevate her feet when she sat." (*Id.* at 112-13.) The ALJ's reasons for discounting PCP's letter, combined with his review and analysis of the objective record, satisfy his duty under the regulations. *See Stephens*, 2020 WL 7122860, at *8 (finding that the ALJ's decision reflects he detailed the reasons why he found the overall evidence, including Dr. Pak's physical assessment, the objective medical evidence, and the course of treatment, unsupported and inconsistent with Plaintiff's subjective allegations of disabling limitation).

Plaintiff also argues that the ALJ failed to evaluate PCP's 10-year treating relationship with her, in violation of 20 C.F.R. § 404.1520c.[6] (doc. 16 at 12.) Subpart (c)(3) of this regulation relates to a medical source's relationship with the claimant and requires consideration of the following: (i) length of the treatment relationship; (ii) frequency of examinations; (iii) purpose of the treatment relationship; (iv) extent of the treatment relationship; and (v) whether an examination was in person or based only on a review of the medical evidence of record. *See* 20 C.F.R. § 404.1520c. As noted, the ALJ's decision did discuss these factors. He noted that PCP had been Plaintiff's primary care provider since at least 2017, PCP did not treat her between 2018 and 2020, he saw her only when she had an illness, he examined her in person three times (only twice during the relevant period) and once by telehealth after that period, and he examined her back only once three years before the letter was written. *See id.*; (doc. 7-1 at 110-12 (citing *id.* at 186, 556-59, 577, 595; doc. 7-4 at 819.)) Moreover, because the ALJ did not "find" that two medical opinions were

---

[6] Despite referencing 20 C.F.R. § 404.1520c, Plaintiff specifically refers to PCP's relationship with her, so only subpart (c)(3) is discussed. (doc. 16 at 12); 20 C.F.R. § 404.1520c(c)(3) (listing relationship with the claimant as the third factor that is considered in evaluating the persuasiveness of medical opinions).

"equally well-supported" but "not exactly the same", "he did not need to detail his consideration of [subpart (c)(3)] in his written opinion." *Cooley*, 587 F. Supp. 3d at 497 (citing 20 C.F.R. § 404.1520c(b)(3)) (remanded on other grounds); (doc. 7-1 at 105-15).

Furthermore, the ALJ found other medical evidence more persuasive. (doc. 7-1 at 110-13.) He considered PCP's own treatment note that Plaintiff had played baseball and climbed ladders in July 2019. (*Id.* at 110, 113 (citing *id.* at 577.)) He also considered Rheumatologist's findings that Plaintiff had mild thoracic muscular pain but normal range of motion in all planes and no active synovitis in the upper and lower extremities in September 2019, and that she had no inflammatory or autoimmune disease in December 2019. (*Id.* at 111, 113 (citing *id.* at 603-06, 608-12.)) The ALJ also found partially persuasive the SAMCs' assessments limiting Plaintiff to "primarily occasional" postural limitations, sedentary exertional work, or occasional climbing of ladders. (*Id.* at 112 (citing *id.* at 192-200, 202-13.))

Because the ALJ appropriately considered PCP's letter and weighed the competing medical evidence, his decision is supported by substantial evidence. *See Webster v. Kijakazi*, 19 F.4th 715, 718-19 (5th Cir. 2021) (holding that substantial evidence supported the ALJ's decision although the record reflected conflicting medical evidence and the ALJ found a treating physician's opinion unpersuasive); *see also Russo*, 805 F. App'x at 272 (citing *Fabian v. Berryhill*, 734 F. App'x 239, 243 (5th Cir. 2018) (unpublished) (holding that the Commissioner did not err by failing to give controlling weight to opinions of physicians who had not treated the claimant during the relevant period and did not refer to her condition during the relevant period). Remand is not required on this issue.

### IV.    CONCLUSION

The Commissioner's decision is **AFFIRMED**.

**SO ORDERED** on this 7th day of March, 2023.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE